UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

JENNIFER RASMUSSON,

        Plaintiff,

Case No.: 19-CV-1625-LA

v.

OZINGA READY MIX CONCRETE, INC.,

        Defendant.

**BRIEF IN SUPPORT OF DEFENDANT OZINGA READY MIX CONCRETE, INC.'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff Jennifer Rasmusson ("Rasmusson") claims Defendant Ozinga Ready Mix Concrete, Inc. ("Ozinga"): interfered with her rights under the Family and Medical Leave Act of 1993 ("FMLA") by failing to return her from FMLA leave to the same or a substantially similar position to that which she occupied prior to her FMLA leave; retaliated against her for her use of FMLA leave and her assertion of rights thereunder; and misclassified her as an overtime exempt employee, thereby failing to pay her time-and-one-half her hourly rate for each hour she worked over forty (40) hours in a workweek, in violation of the Fair Labor Standards Act of 1938 ("FLSA") and the Wisconsin Wage Payment and Collection Law ("WWPCL"). The undisputed facts in this case will show that is not the case and that Rasmusson's claims against Ozinga for FMLA interference and retaliation and failure to pay Rasmusson's overtime under the FLSA and WWPCL should not survive summary judgment.

Ozinga hired Rasmusson as a Dispatcher in the Closing Schedule in its Milwaukee Office. As a Dispatcher in the Closing Schedule, Rasmusson performed all of the duties

1026317\306702803.v2

performed by other Dispatchers, but her shift did not end until the final truck returned. When Rasmusson became pregnant, Ozinga did not make her take FMLA leave to attend prenatal appointments, allowing her to save her full twelve-week leave entitlement for maternity leave. As an accommodation for Rasmusson's need to attend prenatal appointments and for her pregnancy-related work-hour restrictions, Ozinga temporarily placed Rasmusson in an earlier schedule with defined start- and end-times.

When Rasmusson's baby died in utero, Ozinga paid Rasmusson for her full twelve-week FMLA leave. Upon her return to work without workhour restrictions, Ozinga returned Rasmusson as a Dispatcher in the Closing Schedule—the position she had been hired for and maintained throughout her employment. Despite Rasmusson having exhausted her FMLA leave entitlement, Ozinga continued to provide Rasmusson with paid medical leave for a variety of medical issues during 2019. Meanwhile, Rasmusson racked up twenty-six unapproved instances of being tardy for work. When Ozinga warned Rasmusson that further unapproved tardies would result in her termination, Rasmusson resigned—eight months after her return from FMLA leave.

Ozinga properly classified Rasmusson's Dispatcher position as exempt under the administrative exemption to overtime laws under the FLSA and WWPCL. Rasmusson's misclassification claim ignores the significant discretion and independent judgment exercised by Rasmusson in taking customers' orders and then coordinating delivery of the orders in a timely, efficient manner that met all of the customers' needs and expectations—which is directly related to Ozinga's principal business operation.

Simply put, Rasmusson cannot establish any of her claims against Ozinga, and for the reasons set forth below, Ozinga respectfully requests that this Court grant its Motion for Summary Judgment.

1026317\306702803.v2

I.    **GENERAL BACKGROUND REGARDING OZINGA AND RASMUSSON'S EMPLOYMENT.**

Founded in 1928, Ozinga is a fourth-generation family-owned business that supplies ready mix concrete, aggregate materials, other building materials, and energy solutions to a wide array of commercial, residential, industrial, and agricultural customers through an extensive network of truck, rail, barge, and ship terminals. (Defendant's Proposed Findings of Fact [hereinafter "DPFF"] ¶¶ 1-2.) Ozinga's Dispatch & Customer Service Representatives ("Dispatcher") are essential to its business. (DPFF ¶ 3.) Generally, Ozinga's customers call in to one of Ozinga's dispatch centers and place their orders with Ozinga's Dispatchers. (DPFF ¶ 4.) After determining the customers' order, Dispatchers input the customers' orders into Ozinga's order system and schedule the delivery of the customers' orders. (DPFF ¶ 5.) Dispatchers are responsible for coordinating the timely delivery of product from plant locations to the customers' job sites according to the customers' requests and expectations while using the most efficient and cost-effective processes possible. (DPFF ¶ 6.)

Ozinga's Milwaukee Office typically utilizes five Dispatchers who have schedules with staggered early start times and one Dispatcher who has the Closing Schedule (the "Closer" or "Closing Dispatcher" ). (DPFF ¶ 7.) The Closing Dispatcher is not a distinct position from the Dispatcher positions, just a different schedule. (DPFF ¶ 8.) Once hired as a Closing Dispatcher, Dispatchers stay in that position until a Dispatcher position in a different schedule opens. (DPFF ¶ 9.)

Ozinga maintains separate Employee Handbooks for its union and non-union employees. (DPFF ¶ 10.) Ozinga's non-union Employee Handbook (the "Employee Handbook") does not include a written progressive disciplinary policy. (DPFF ¶ 11.) In regard to attendance, Ozinga's Employee Handbook states:

1026317\306702803.v2

The Company depends on employees to come to work each day, arrive on time, and not to leave work earlier than scheduled. Regular and timely attendance is an expected and essential part of every position at the Company. Without prior authorization from their supervisor, or an approved absence such as a prearranged vacation day or leave of absence, employees are expected to be at work every day. Excessive absenteeism, tardiness, leaving work early, or a suspicious pattern of such conduct (e.g., repeated absences on a particular day of the week, sick days repeatedly coupled with a regular day off), may result in disciplinary action.

("Attendance Policy"). (DPFF ¶ 12.)

Rasmusson worked at Ozinga in its Milwaukee, Wisconsin office from March 6, 2017 to August 14, 2019 as a Dispatcher. (DPFF ¶ 13.) Rasmusson received and signed Ozinga's Employee Handbook. (DPFF ¶ 14.) Todd Olson ("Olson"), Dispatch Manager for Ozinga's Milwaukee Office, was Rasmusson's direct supervisor. (DPFF ¶ 15.)

## II.    RASMUSSON'S INTERVIEW AND HIRE AT OZINGA.

In late 2016 and early 2017, Ozinga sought to hire a Dispatcher in its Milwaukee Office in the closing schedule. (DPFF ¶ 18.) Chad Smits ("Smits"), Dispatch Manager for Ozinga's Elgin, Illinois Office, referred Rasmusson to apply for the Dispatcher position. (DPFF ¶ 19.) After applying for the Dispatcher position, Rasmusson interviewed with Justin Kratochvil ("Kratochvil"), Regional Manager for Safety, Environmental, and Human Resources; Lisa Kinter ("Kinter"), Human Resources and Safety Specialist; and Olson. (DPFF ¶ 20.)

During Rasmusson's interview, Kratochvil, Olson, and Kinter expressed and emphasized to Rasmusson that the position Ozinga was hiring for was the Closing Schedule. (DPFF ¶ 21.) Kratochvil, Olson, and Kinter believed it was important to emphasize that the position was for the closing schedule so Rasmusson understood that was the schedule they were hiring for and what the expectations of the position were. (DPFF ¶ 22.) Ozinga hired Rasmusson as a Dispatcher in the Closing Schedule. (DPFF ¶ 23.)

4

## III.   RASMUSSON'S TRAINING AND WORK AS A CLOSING DISPATCHER.

In order properly educate newly-hired Dispatchers with the position, Ozinga's business and integral business units, and the ready mix concrete industry, Ozinga's Dispatchers undergo several weeks of extensive training. (DPFF ¶ 24.) Ozinga's Dispatchers attend orientation at Ozinga's Headquarters in Mokena, Illinois; one-to-two weeks observing different job sites with Quality Control, one-to-two weeks on-the-job shadowing with other Dispatchers, then limited phone answering on their own with order entry review by other Dispatchers. (DPFF ¶ 25.) The Dispatcher position involves continual learning, as they are continually presented with new and different challenges. (DPFF ¶ 26.) Rasmusson underwent the training typical for Ozinga Dispatchers. (DPFF ¶ 27.)

After Rasmusson's training was completed, Olson assigned her to the Closing Schedule. (DPFF ¶ 28.) In the Closing Schedule, it is unknown from day-to-day when the end of the shift will be, as Dispatchers stay until the last truck returns. (DPFF ¶ 29.) This can result in longer hours for Closing Dispatchers in the summer, when Ozinga is busiest, and occasions during the winter, when Ozinga is not as busy, that Closing Dispatchers generally work less than forty (40) hours per week. (DPFF ¶ 30.)

## IV.   MARK YELLEN TRANSFERRED TO OPEN DISPATCHER POSITION.

Mark Yellen ("Yellen") was hired by Ozinga on March 22, 2016 as a Batchman at Ozinga's Yard in Lisbon, Wisconsin. (DPFF ¶ 31.) As a Batchman, Yellen had experience with dispatching. (DPFF ¶ 32.) Prior to his employment at Ozinga, Yellen had been employed within the ready-mix concrete industry for over twenty (20) years, including positions as a plant manager and managing a dispatch department for a competitor of Ozinga. (DPFF ¶ 33.) Catherine Linscott ("Linscott") worked as a Dispatcher in Ozinga's Milwaukee Office from

5

September 28, 2015 through March 2, 2018. (DPFF ¶ 34.) Linscott worked the Midday Schedule at the end of her employment, working 7:00 a.m. to 3:00 p.m. in her final week. (DPFF ¶ 35.)

Ozinga formally filled the open Dispatcher position during the Midday Schedule vacated by Linscott with Yellen. (DPFF ¶ 36.) Yellen had considerable knowledge, experience, expertise, skill, and ability to perform in Ozinga's Dispatch position, and was chosen to fill the open Dispatcher position during the Midday Schedule vacated by Linscott for these reasons. (DPFF ¶¶ 37-38.) In filling Linscott's position, Yellen's core hours were 7:00 a.m. to 5:00 p.m. (DPFF ¶ 39.)

Kratochvil completed an Employee Change Form for Yellen to formally fill the open position vacated by Linscott with an April 30, 2018 effective date of change. (DPFF ¶ 40.) Rasmusson was not put into the open Dispatcher position during the midday schedule in April 2018. (DPFF ¶ 41.) If Rasmusson had formally filled Linscott's hours, Ozinga would have completed an Employee Change Form. (DPFF ¶ 42.) No Employee Change Form was completed for Rasmusson to fill Linscott's position. (DPFF ¶ 43.) Yellen worked in the Midday Schedule (7:00 a.m. to 5:00 p.m.) from the week of May 21, 2018 until the week of June 25, 2018. (DPFF ¶ 44.)

## V.    RASMUSSON'S PREGNANCY, RESTRICTIONS, AND ACCOMMODATIONS.

Rasmusson became pregnant in early 2017, and she informed Ozinga of the same. (DPFF ¶ 45.) Ozinga did not require Rasmusson to take FMLA leave for her prenatal appointments, so she could save the leave for when her baby was born. (DPFF ¶ 46.) Starting the week of June 25, 2018, Olson switched Rasmusson to work the midday schedule and Yellen to work the Closing Schedule to allow Rasmusson to attend appointments in the afternoon and evening. (DPFF ¶ 48.)

On July 9, 2018, due to her pregnancy, Rasmusson's health care provider implemented work restrictions that: she was not to exceed more than fifty (50) hours per week, a thirty-minute

6

lunch breach during each shift, and increased bathroom breaks, as necessary. (DPFF ¶ 49.) On August 23, 2018, Rasmusson's health care provider implemented updated work restrictions that Rasmusson work no more than forty (40) hours per week and no work on Saturdays. (DPFF ¶ 50.) Olson moved Rasmusson to the Midday Schedule as an accommodation for hours restrictions of working no more than fifty (50) and later forty (40) hours per week to provide her with a more consistent, controllable work hours because of the set end time. (DPFF ¶ 51.) Rasmusson was only placed in the earlier schedule as an accommodation for her pregnancy and related restrictions, not to assist her with child care after her baby was born. (DPFF ¶¶ 52-53.) Ozinga accommodated all of Rasmusson's restrictions implemented by her health care provider during her pregnancy. (DPFF ¶ 54.) It was expected that when Rasmusson no longer had work restrictions she would return to her Closing Schedule. (DPFF ¶ 55.)

## VI.   RASMUSSON TAKES TWELVE WEEKS OF FMLA LEAVE.

On September 14, 2018, Rasmusson informed Kratochvil, Olson, and Kinter that her baby died in utero. (DPFF ¶ 56.) Devastated about the news about the death of Rasmusson's baby, Ozinga offered Rasmusson the opportunity to write an announcement to other employees, which she received expressions of sympathy in response to and appreciated. (DPFF ¶ 57.) Rasmusson was on paid FMLA leave from September 14, 2018 through December 9, 2018. (DPFF ¶¶ 58-59.) During her FMLA leave, Yellen continued to work Rasmusson's Closing Schedule. (DPFF ¶ 60.)

## VII.   RASMUSSON'S RETURN FROM FMLA LEAVE.

Upon her return from FMLA leave, Rasmusson would no longer have restrictions in place affecting the number of hours she could work each week. (DPFF ¶ 61.) Therefore, Olson scheduled Rasmusson to return from her FMLA leave to the Closing Schedule because that was the schedule she had been hired for. (DPFF ¶¶ 62-63.) After Rasmusson's return from FMLA

7

leave, Yellen returned to the Midday Schedule he occupied prior to switching to the Closing Schedule to cover Rasmusson's restrictions and FMLA leave. (DPFF ¶ 64.) Returning Yellen to the day shift was not a means of rewarding him for covering during Rasmusson's absence. (DPFF ¶ 65.)

On December 7, 2018, Olson sent an email to the Milwaukee dispatchers, including Rasmusson, with their schedules for the upcoming week starting December 10, 2018. (DPFF ¶ 66.) After receiving Olson's email, Rasmusson questioned why she was being returned to the closer position. (DPFF ¶ 67.) On December 7, 2018, Rasmusson complained to Christine Lopez ("Lopez"), Benefits Administrator, that she did not feel that she was returning to the position that she had prior to her FMLA leave. (DPFF ¶ 68.) Kratochvil and Olson discussed Rasmusson's complaint that she did not feel that she was returning to the position she had prior to her FMLA leave, and confirmed that she was returning to the position she was hired for. (DPFF ¶ 69.)

After Rasmusson's complaint regarding her position upon return from FMLA leave, Lopez, Kratochvil, Olson, and Peggy Smith ("Smith"), Human Resources Manager, had a conference call to discuss Rasmusson's concerns. (DPFF ¶ 70.) Kratochvil and Olson indicated to Lopez that Rasmusson had been hired for the Closing Schedule, that they changed her schedule from closing to accommodate her pregnancy restrictions, that the schedule change was not an official change, and that upon her return to work she would return to the Closing Schedule. (DPFF ¶ 71.)

On December 12, 2018, a meeting was held between Rasmusson, Kratochvil, Olson, and Kinter to discuss her concerns regarding her schedule upon returning to work. (DPFF ¶ 72.) During the meeting, it was explained to Rasmusson that she was returned from her FMLA leave to a Closing Schedule because she was hired as a Closer, she was not formally changed to

1026317\306702803.v2

Linscott's schedule, and any change to her Closing Schedule was a temporary accommodation for her pregnancy and restrictions. (DPFF ¶ 73.)

Kratochvil and Olson were not frustrated with all of the back and forth regarding Rasmusson's FMLA leave and her return to work from FMLA leave. (DPFF ¶ 74.) Olson did not believe Rasmusson should be disciplined for her use of FMLA leave. (DPFF ¶ 75.) Kratochvil and Olson never discussed or considered disciplining Rasmusson for her use of FMLA leave. (DPFF ¶¶ 76-77.) Rasmusson was not disciplined because of her FMLA leave. (DPFF ¶ 78.) Olson's decision to return Rasmusson to the Closing Schedule she had been hired for was not influenced by her use of FMLA leave. (DPFF ¶ 79.)

## VIII. RASMUSSON'S CONTINUED MEDICAL LEAVES AND UNAPPROVED TARDIES.

On January 23, 2019, Ozinga received a letter from Elizabeth Yahr, PA-C, informing it that Rasmusson was hospitalized from January 22-23, 2019, and that she could not return to work until January 27, 2019. (DPFF ¶ 80.) Ozinga denied Rasmusson's request for FMLA leave because she had exhausted her FMLA entitlements during her twelve-week leave from September 14, 2018 to December 9, 2018, however because she had another health condition, Ozinga granted Rasmusson's leave and paid her for the time off. (DPFF ¶ 81.) On Febraury 14, 2019, Ozinga received a letter from Constance Swanson, R.N, excusing Rasmusson from work from February 13, 2019 to February 17, 2018, and indicating that Rasmusson would return to work on February 18, 2019. (DPFF ¶ 82.) Despite having exhausted her FMLA leave entitlement, Ozinga granted Rasmusson's leave from February 13, 2019 to February 17, 2019 and paid her for the time off. (DPFF ¶ 83.)

On February 21, 2019, Rasmusson emailed Kratochvil questions about her transition to being salary-paid. (DPFF ¶ 84.) Rasmusson concluded her email to Kratochvil:

1026317\306702803.v2

> I am very grateful for my employment at Ozinga. I am the only one I know of out of all the women who went through what we went through as mothers and received 1) the FMLA leave I did and 2) with pay. For that reason alone, I am acutely aware of the grace shown to me and will never forget that. It's no short of honorable of part of the business.

(DPFF ¶ 85.) On March 30, 2019, Ozinga received a letter from Volha Haliantava, M.D., excusing her from work from April 1, 2019 through April 3, 2019. (DPFF ¶ 86.) Despite having exhausted her FMLA leave entitlement, Ozinga granted Rasmusson's leave from April 1, 2019 through April 3, 2019 and paid her for the time off. (DPFF ¶ 87.) On August 8, 2019, Ozinga received a letter from Katherine Flynn, Psy.D., recommending Rasmusson be excused from work from August 7, 2019 to August 14, 2019. (DPFF ¶ 88.)

During 2019, Rasmusson had been tardy to work twenty-six (26) times without approval. (DPFF ¶ 89.) Rasmusson's unapproved tardies ranged from only a few minutes late to over an hour-and-a-half late on at least one occasion. (DPFF ¶ 90.) Rasmusson's unapproved tardies were in violation of Ozinga's Attendance Policy. (DPFF ¶ 91.)

## IX.  RASMUSSON'S WARNING AND RESIGNATION.

On August 9, 2019, Kratochvil provided Rasmusson with a letter granting Rasmusson's medical leave until August 14, 2019, despite having exhausted her FMLA leave and having expended all of her vacation days. (DPFF ¶ 92.) The letter further highlighted that Rasmusson had been tardy to work twenty-six (26) times in 2019 without approval, ranging from only a few minutes late to over an hour-and-a-half late on at least one occasion. (DPFF ¶ 93.) Based on the number of unexcused times Rasmusson had been tardy, Ozinga warned Rasmusson that if she failed to show up for work on time for her scheduled shifts, Ozinga would have no choice but to terminate her employment. (DPFF ¶ 94.) Enclosed with the letter to Rasmusson was a summary of Rasmusson's time off from January 1, 2018 through August 13, 2019. (DPFF ¶ 95.)

1026317\306702803.v2

On August 9, 2019, Rasmusson emailed Kratochvil requesting an explanation for "partial days" and "on time," as used in Kratochvil's August 9, 2019 letter. (DPFF ¶ 96.) Kratochvil responded to Rasmusson, explaining that "partial days" referred to days she was permitted by Ozinga to arrive late or leave early, but which were not counted against her available vacation time, that references to being "on time" referred to days Rasmusson arrived to work after the start of her shift without first obtaining permission from Ozinga, and that no further tardiness by Rasmusson would be tolerated. (DPFF ¶ 97.) Rasmusson responded to Kratochvil's email indicating her belief Kratochvil had told her when she was hired that he did not care about being five-to-ten minutes late, but clarifying what the expectation moving forward is. (DPFF ¶ 98.)

Kratochvil disagreed with Rasmusson's assertion, stating he never told anyone, including her, that it is acceptable to be five-to-ten minutes late, and that being on-time continues to mean the same thing it always has—being at her desk ready to work at her scheduled start time. (DPFF ¶ 99.) Rasmusson disagreed with Kratochvil, but indicated she planned on "being ready to go by 9:00 a.m." (DPFF ¶ 100.) Rasmusson was next scheduled to work at Ozinga on August 14, 2019 at 9:00 a.m. (DPFF ¶ 101.) Rasmusson did not return to work after her August 7, 2019 through August 13, 2019 leave. (DPFF ¶ 102.)

On August 14, 2019, Rasmusson emailed her letter of resignation to Olson, Kinter, Kratochvil, Smits, and Smith. (DPFF ¶ 103.) Generally, Rasmusson cited feeling singled out for making mistakes, believing she had received the open Dispatcher position in April 2018, believing Ozinga returned her to a different position after her FMLA leave, and her amount of pay upon switching to salary as reasons for her resignation. (DPFF ¶ 104.) Had Rasmusson timely reported to work on August 14, 2019, her employment with Ozinga would have continued. (DPFF ¶ 105.) Rasmusson acknowledged that she had the option to return to work

1026317\306702803.v2

after her leave, stating, "I tried to work up what I needed to supply you with two weeks notice and perform . . . ." (DPFF ¶ 106.) Rasmusson was granted and paid for all of the medical leaves she requested after she exhausted her FMLA leave entitlement by taking leave from September 14, 2018 to December 9, 2018. (DPFF ¶ 107.)

## X. RASMUSSON'S CLASSIFICATION AS OVERTIME EXEMPT.

On March 4, 2019, Ozinga re-classified Rasmusson as overtime exempt and started to receive an annual salary of $39,500, which was paid out at $1,519.23 every two weeks—no matter how many hours she worked each week. (DPFF ¶ 108.) Kratochvil performed an extensive analysis of the straight-time compensation, overtime compensation, vacation/holiday/disability compensation Rasmusson received while hourly-paid to determine her salary to ensure it was comparable to what she had been earning. (DPFF ¶ 109.) Yellen was also re-classified as overtime exempt and started to receive an annual salary at the same time as Rasmusson. (DPFF ¶ 110.)

When determining whether an employee may be classified as overtime exempt, Ozinga analyzes and considers the different exemption categories and applies the duty tests as determined by the FLSA. (DPFF ¶ 111.) Ozinga performed this same FLSA analysis and consideration when re-classifying Rasmusson as overtime exempt. (DPFF ¶ 112.) When classifying Rasmusson and other Dispatchers as overtime exempt, Ozinga relied on the administrative exemption and evaluated Dispatchers' impact on the business and working independently. (DPFF ¶ 113.)

The job duties listed in Ozinga's Dispatcher position description (effective December 2019) are the same job duties as existed for the Dispatcher position during 2017, 2018, and 2019, prior to the existence of the written position description. (DPFF ¶ 114.) As a result of the re-classification, Rasmusson's position as a Dispatcher did not change. (DPFF ¶ 115.) Dispatchers

12

manage their job and workload, handling the sequence of events between the customer and delivering the product. (DPFF ¶ 116.) Dispatchers are required to exercise discretion and independent judgment on a daily basis to accomplish their jobs. (DPFF ¶ 117.)

Rasmusson performed work that is critical to Ozinga's ready-mix business operations, and the business operations of Ozinga's customers, because she coordinated orders between Ozinga's plants and drivers, and Ozinga's customers and their project/job sites. (DPFF ¶ 118.) As a Dispatcher on the Closing Schedule, Rasmusson performed all of the Principal Duties and Responsibilities listed on the Dispatch & Customer Service Representative position description. (DPFF ¶ 119.) On certain Saturdays, Rasmusson worked as the only Dispatcher in the Milwaukee Office and was required to perform all of the duties Dispatchers without oversight. (DPFF ¶ 121.)

Based on her knowledge, training, and information provided by the customer about their project, Rasmusson advised and consulted with customers to make decisions about product mix to select the best product for their project. (DPFF ¶ 122.) Rasmusson was required to have specialized knowledge about various types of concretes and additives, mix designs, and what their particular uses are, and evaluated the customers' projects, weather conditions, and time of year to suggest value-add products to customers for their projects. (DPFF ¶ 123.) The majority of calls taken by Dispatchers involve a discussion with customers about mix design and value-add products. (DPFF ¶ 124.) While experienced contractors typically provide the quantity of product necessary for their job, Rasmusson consulted with non-experienced contractors and homeowners determine the proper quantity for the job they are performing. (DPFF ¶ 125.)

Rasmusson advised customers regarding loads limits as it pertains to posted road weight limits, especially during freeze/thaw cycles in the spring, and road closures, based on

1026317\306702803.v2

information provided by customers or by public notice. (DPFF ¶ 126.) Rasmusson selected and assigned drivers to deliver customers' orders based on availability, union rules, and location. (DPFF ¶ 127.) To ensure maximum utilization and efficiency of Ozinga's resources, while also meeting the needs and expectations of customers, Rasmusson exercised independent discretion to schedule mixer trucks throughout the day to maintain an even schedule and avoid overloading any given part of the schedule. (DPFF ¶ 128.)

Rasmusson was required to monitor a GPS map and truck-tracking screen to ensure orders are moving in a timely manner, and if there was an issue with a truck or order, Rasmusson was responsible for working with the driver and/or the plant to create a solution and resolve issue. (DPFF ¶ 129.) Rasmusson monitored truck and order status to advise customers regarding order conflicts and exercised independent discretion to resolve order scheduling conflicts to ensure the needs of customers were met. (DPFF ¶ 130.)

Rasmusson was required to complete orders accurately and timely to ensure customer satisfaction and Ozinga profitability. (DPFF ¶ 131.) Rasmusson had independent discretion to create shift start and end times for Ozinga's drivers based on the demands for the following day, and exercised independent discretion to adjust those times throughout the day, as necessary, based on order status and workflow. (DPFF ¶ 132.) Rasmusson was required to evaluate the remaining workload for each day and union rules to determine when to send drivers home. (DPFF ¶ 133.) To ensure Ozinga's drivers did not violate Department of Transportation ("DOT") regulations, Rasmusson was required to monitor drivers' work hours and advise them to avoid exceeding the maximum driving hours allowable by the DOT, and to monitor drivers' shift end and, as necessary, adjusted their next start time to ensure at least the minimum required time between shifts. (DPFF ¶ 134.)

1026317\306702803.v2

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if it is one upon which a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material" facts are "outcome determinative under the governing law." *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir. 1990).

To overcome summary judgment, the nonmoving party may not simply rest upon allegations in the pleadings. Fed. R. Civ. P. 56(e); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Instead, it must produce enough specific material facts in support of its claim to sustain its burden at trial. *Celotex Corp.*, 477 U.S. at 324; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To that end, the non-moving party must present evidence, not speculation and unsupported conclusions of fact to support its claim. *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146-47 (7th Cir. 1994.) A mere scintilla of evidence does not create a triable issue of material fact. *See, e.g.*, *Murphy v. ITT Technical Services, Inc.*, 176 F.3d 934, 936 (7th Cir. 1999.). Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment…" *Richter v. Hook-SuperX*, 142 F.3d 1024, 1027 (7th Cir. 1998) (citing *Anderson*, 477 U.S. at 247-48). The factual dispute must be material. *Id.*

1026317\306702803.v2

## ARGUMENT

### I. OZINGA DID NOT VIOLATE OR INTERFERE WITH RASMUSSON'S RIGHTS UNDER THE FMLA.

Rasmusson claims that Ozinga interfered with her FMLA right to be restored to the position she held at the time her FMLA leave commenced. However, as will be shown below, Rasmusson cannot establish any disputed elements of her claim.

The FMLA permits eligible employees to take medical leave under certain conditions. *See* 29 U.S.C. §§ 2612, 2614. Upon return to work from FMLA leave, employees are "to be restored by the employer to the position of employment held by the employee when the leave commenced" or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1). However, a restored employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave," and an employer may refuse restoration on such basis. ***Kohls v. Beverly Enters. Wis., Inc.***, 259 F.3d 799, 805 (7th Cir. 2001) (citing 29 U.S.C. § 2614(a)(3)(B)).

To prevail on an FMLA interference claim, a plaintiff must establish: (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled. ***Ames v. Home Depot U.S.A., Inc.***, 629 F.3d 665, 668-69 (quoting ***Caskey v. Colgate-Palmolive Co.***, 535 F.3d 585, 590 (7th Cir. 2008)). Only the fifth element is in dispute here.

When an employee alleges that the employer interfered with her substantive rights under the FMLA, she is required to "establish, by a preponderance of the evidence, that she is entitled to the benefit she claims." ***Diaz v. Fort Wayne Foundry Corp.***, 131 F.3d 711, 713 (7th Cir.

16

1997). The employer may then present evidence to show that the employee would not have been entitled to her position even if she had not taken leave. ***Rice v. Sunrise Express, Inc.***, 209 F.3d 1008, 1017-18 (7th Cir. 2000), *reh'g en banc denied,* 217 F.3d 492, *cert. denied,* 531 U.S. 1012, 121 S. Ct. 567, 148 L. Ed. 2d 486 (2000).

**A.     Rasmusson was a Dispatcher in the Closing Schedule Prior to Her FMLA Leave.**

Rasmusson claims Ozinga interfered with her FMLA rights because she was not restored to the same position or a position equivalent to the position she held prior to her FMLA leave. This, however, is simply not the case. Rasmusson was hired by Ozinga as a Dispatcher for the Closing Schedule in March 2017. Rasmusson worked the Closing Schedule until late June 2018, at which time Olson scheduled her for an earlier shift. Rasmusson claims this change in schedule was because she was moved to an open Dispatcher position vacated by Catherine Linscott. However, there is no evidence to support her contention.

Ozinga transferred Yellen from a Batchman position to Dispatcher to fill Linscott's position internally. Yellen was selected to fill this open Dispatcher position because of his considerable experience, knowledge, background, education, in addition to seniority. Ozinga completed an Employee Change Form for Yellen to formally fill the open position vacated by Linscott with an April 30, 2018 effective date of change. No such Employee Change Form exists for Rasmusson because she did not fill that position. Tellingly, Yellen worked in the Midday Schedule (7:00 a.m. to 5:00 p.m.), which Linscott worked, from the week of May 21, 2018 until the week of June 25, 2018.

**1.     Ozinga scheduled Rasmusson in the Midday Schedule as an accommodation for her pregnancy and related restrictions.**

During the week of June 25, 2018, Olson scheduled Rasmusson for the Midday Schedule, 7:00 a.m. to 5:00 p.m. (ten hours per day), to allow her to attend prenatal appointments. When

1026317\306702803.v2

Rasmusson received work restrictions from her health care provider limiting the number of hours she worked per week to fifty (50), Olson continued her in this schedule because it afforded her a set end time (contrary to the Closing Schedule) and allowed her to be scheduled according to her restrictions (ten hours per day, at five days per week). When Rasmusson's restriction was lowered to forty (40) hours scheduled per week, Olson changed Rasmusson's schedule to 8:30 a.m. to 5:00 p.m. with a half-hour lunch (eight hours per day, at five days per week). The only reason for Rasmusson schedule change was to accommodate her pregnancy and pregnancy-related restrictions.

### B. Ozinga Returned Rasmusson from FMLA Leave to the Closing Schedule.

When Rasmusson returned from her FMLA leave in mid-December 2018, she had no restrictions regarding when or how many hours she could work. Because of this, Olson returned Rasmusson to the Closing Schedule—which she was hired for—and returned Yellen to the Midday Schedule—which he had formally filled in April 2018. Had Rasmusson not taken FMLA leave, she would have only continued in the Midday Schedule until her health care provider lifted her restrictions, at which time she would have returned to the Closing Schedule—the position she was hired for.

Despite Rasmusson's contention otherwise, it is apparent that she was not entitled to return to the Midday Schedule upon her return from FMLA leave, because that was not her position prior to her FMLA leave. Rasmusson was never moved from the Closing Schedule, but rather temporarily accommodated for her pregnancy-related work hours restrictions. Therefore, Rasmusson occupied the Closing Schedule position prior to her leave, and she was returned to that position upon her return from FMLA leave. Accordingly, this Court should grant Ozinga summary judgment on Rasmusson's FMLA interference claim.

1026317\306702803.v2

## II.   OZINGA DID NOT RETALIATE AGAINST RASMUSSON BASED ON HER EXERCISE OF HER FMLA RIGHTS.

Rasmusson claims that Ozinga retaliated against her for exercise of her FMLA rights and for her FMLA complaint by constructively discharging her. However, as will be shown below, Rasmusson cannot establish any disputed elements of her claim.

To prevail on an FMLA retaliation claim, a plaintiff must establish: (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two. *Carter v. Chi. State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). The Seventh Circuit recently removed any perceived requirement to place evidence into discreet "direct" or "indirect" approaches. *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Therefore, the Court should instead "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation. *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz*, 834 F.3d at 764-66).

Only the first element of Rasmusson's retaliation claim is undisputed: she took and exhausted her FMLA leave entitlement. Rasmusson cannot, however, establish the final two elements of her claims.

### A.   Rasmusson was Not Constructively Discharged from Her Employment at Ozinga.

A constructive discharge constitutes an adverse employment action. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)). A person is constructively discharged not when she is terminated from her employment, but quits because the working conditions are such that remaining in that employment is "simply intolerable." *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998)). Resignation must be the only reasonable alternative available. *Cooper-Schut v. Visteon*

19

1026317\306702803.v2

*Auto. Sys.*, 361 F.3d 421, 428 (7th Cir. 2004). The Seventh Circuit has stated plainly: "It is difficult for a plaintiff to show a constructive discharge." *Id.*

> ### 1. Rasmusson cannot establish she was constructively discharged due to a hostile work environment.

Constructive discharge occurs when an employee's working conditions are so intolerable that a reasonable person in the employee's position would have been forced to quit. ***Williams v. Waste Management of Illinois, Inc.***, 361 F.3d 1021, 1034 (7th Cir. 2002). To establish that she suffered a constructive discharge, the plaintiff must not only demonstrate that a hostile work environment existed, "but also that the abusive working environment was so intolerable that her resignation was an appropriate response." *McPherson*, 379 F.3d at 440. Conditions for a constructive discharge are "even more egregious than the high standard for hostile work environment claims, because, in the ordinary case, an employee is expected to remain employed while seeking redress." ***Boumehdi v. Plastag Holdings, LLC***, 489 F.3d 781, 789 (7th Cir. 2007).

Conditions that create a hostile work environment must be "sufficiently severe or pervasive to alter the conditions of employment." ***Milligan-Grimstad v. Stanley***, 877 F.3d 705, 714 (7th Cir. 2017) (quoting ***Scruggs v. Garst Seed Co.***, 587 F.3d 832, 840 (7th Cir. 2009)). To determine whether the conduct is "sufficiently severe or pervasive," courts will consider the severity and frequency of the conduct as well as whether it is "physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.*

Rasmusson may attempt to point to her belief that certain coworkers were talking about her behind her back, and her belief that she was being unfairly criticized for mistakes that were made, as evidence of a hostile work environment. However, boorish behavior by coworkers and perceived unwarranted scrutiny is not sufficient to establish constructive discharge. *Compare*

1026317\306702803.v2

*Lindale*, 145 F.3d at 956 (holding that boorish behavior by coworkers was insufficient to establish constructive discharge) *with* ***Taylor v. Western & S. Life Ins. Co.***, 966 F.2d 1188, 1191 (7th Cir. 1992) (finding constructive discharge where plaintiffs' boss constantly peppered plaintiffs with racist comments, brandished a pistol and held it to one plaintiff's head). Tellingly, within two months of her return from FMLA leave, Rasmusson praised Ozinga in an email to Kratochvil for how it handled her FMLA leave. Based on the record at this point, Rasmusson can cite no evidence sufficient to establish a hostile work environment, let alone one where her resignation was the only appropriate response.

>    **2.    Rasmusson's termination was not imminent and inevitable such that quitting to avoid termination constitutes constructive discharge.**

Alternatively, Rasmusson may claim that Ozinga's warning that she would face termination if she failed to be on time for work upon her return from leave made it clear that her termination was imminent, and that she was forced to quit to avoid termination. While in certain situations, quitting to avoid an imminent and inevitable termination may constitute constructive discharge, such is not the case here. *See* ***EEOC v. University of Chicago Hospitals***, 276 F.3d 326, 329-30, 332 (7th Cir. 2002). A working condition does not become intolerable or unbearable merely because a "prospect of discharge lurks in the background." ***Chapin***, 621 F.3d at 679 (quoting ***Cigan v. Chippewa Falls Sch. Dist.***, 388 F.3d 331, 333 (7th Cir. 2004)).

In ***University of Chicago Hospitals***, the Seventh Circuit ruled a claim of constructive discharge could move forward where an employee arrived at work to find her belongings packed and her office being used as storage, which came after another employee was fired for refusing to fire the plaintiff, she suddenly received negative performance evaluations, and she was told a minor mistake was the "last straw." 276 F.3d at 329-30, 332. Unlike in ***University of Chicago Hospitals***, there is nothing here to indicate that Rasmusson termination was an imminent and

1026317\306702803.v2

inevitable event. 276 F.3d at 332. This is not a situation where the "handwriting was on the wall" and the Rasmusson quit "just ahead of the fall of the axe." ***Lindale***, 145 F.3d at 956.

Rasmusson's claim that Ozinga threatened to terminate her if she were late for work again is insufficient to deem her resignation a constructive discharge. Had Rasmusson timely reported to work on August 14, 2019, her employment with Ozinga would have continued. Rasmusson only faced termination if she continued to be late. In fact, Rasmusson acknowledged multiple times prior to her resignation that she had the option to return to work after her leave. In her emails with Kratochvil seeking clarification of his August 9th letter, Rasmusson stated, "I will plan on being ready to go by 9:00 a.m." In her resignation letter she stated, "I tried to work up what I needed to supply you with two weeks notice and perform . . . ." These statements belie any contention by Rasmusson that she believed her termination to be imminent and inevitable.

Further, Rasmusson did not resign immediately after being warned that further tardiness would result in her termination. Instead, she waited six days until the day she was to return to work to resign. Here, even construing all of the evidence in Rasmusson's favor, no reasonable employee standing in Rasmusson's shoes would believe that had she not resigned, she would have been immediately fired. Therefore, Rasmusson cannot establish that she was constructively discharged and her FMLA retaliation claim fails. Accordingly, this Court should grant Ozinga summary judgment on this claim.

### B. Rasmusson Cannot Establish a Causal Connection Between Protected Activity and Her Resignation.

Assuming, *arguendo*, Rasmusson establishes that she was constructively discharged—which she cannot—she must then establish that there is a causal link between her protected activity and her resignation. Rasmusson cannot establish that a causal connection exists between her protected activity and her resignation because the temporal proximity between exercising her

1026317\306702803.v2

FMLA rights and her FMLA complaint and her resignation is not sufficient to establish a causal connection.

> ### 1. The temporal proximity between Rasmusson exercising her FMLA rights and her FMLA complaint and her resignation is insufficient to establish a causal connection.

Mere temporal proximity between the time of the protected activity and a plaintiff's adverse action and the mere order of events is not sufficient to establish a causal connection between a protected activity and an adverse action and survive summary judgment. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006); *see also Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact."); *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005) ("suspicious timing alone rarely is sufficient to create a triable issue.").

The Seventh Circuit has held that as short as a two-month proximity between a complaint and adverse employment action was insufficient to show a causal connection. *Tomanovich*, 457 F.3d at 665; *see also, e.g., Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (holding that a three-month proximity alone was insufficient to establish a causal connection); *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002) (holding that a four-month proximity was insufficient to establish a causal connection). Indeed, the time period between the protected activity and the adverse action must be "very close" to survive summary judgment. *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012).

Here, eight months passed between Rasmusson's exercise of her FMLA rights and her complaint about her position upon return from FMLA leave, which occurred in mid-December 2018, and the date of her resignation, August 14, 2019. Outside of timing, Rasmusson cannot point to any other evidence to establish a causal connection between her protected activity and her resignation. Therefore, merely the eight-month proximity between Rasmusson exercise of

1026317\306702803.v2

her FMLA rights and her complaint and her resignation should be found to be insufficient to create a genuine issue of material fact regarding causation.

Any connection claimed by Rasmusson between her exercise of FMLA rights and her complaint and her termination if belied by her February 21, 2019 email to Kratochvil. Rasmusson closed this email by stating:

> I am very grateful for my employment at Ozinga. I am the only one I know of out of all the women who went through what we went through as mothers and received 1) the FMLA leave I did and 2) with pay. For that reason alone, I am acutely aware of the grace shown to me and will never forget that. It's no short of honorable of part of the business.

Given the above, even if Rasmusson can establish she was constructively discharged, she cannot establish a causal connection between that and her exercise of FMLA rights, and her FMLA retaliation claim fails. Accordingly, this Court should grant Ozinga summary judgment on Rasmusson's FMLA retaliation claim.

## III.    OZINGA PROPERLY CLASSIFIED RASMUSSON'S POSITION AS EXEMPT UNDER THE FLSA AND WWPCL'S ADMINISTRATIVE EXEMPTION.

Ozinga properly classified Rasmusson's Dispatcher position as overtime exempt under the administrative exemption of the FLSA and WWPCL.  Rasmusson's classification was proper because: (1) she was paid on a salary basis as defined by the regulations, (2) her primary duties as a Dispatcher was directly related to Ozinga's general business operation, and (3) her primary duties includes the exercise of discretion and independent judgment with respect to matters of significance. For the reasons stated below, this Court should grant Ozinga summary judgment on Rasmusson's FLSA and WWPCL claims.

1026317\306702803.v2

**A.    This Court Should Construe Wisconsin's Administrative Exemption in Accordance with the FLSA's Administrative Exemption.**

Wisconsin law carves out from the state's overtime requirements employees who fit within an exemption for administrative employees. Wis. Admin. Code § DWD 274.04(1)(b). The WWPCL explicitly directs courts to follow the FLSA's regulations when interpreting Wisconsin's overtime exemptions, and envisions that the federal regulations will change over time. Wis. Admin. Code § DWD 274.04 (directing that the Wisconsin exemptions "shall be interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act and the Code of Federal Regulations as amended, relating to the application of that act to all issues of overtime"). Accordingly, Rasmusson's FLSA and WWPCL claims should be decided in conjunction and according to the FLSA's regulations and case law interpreting such.

**B.    FLSA's Administrative Exemption.**

The FLSA mandates that employers must pay their employees at minimum one-and-one-half times their regular wages for any number of hours worked that exceed forty in any given week. 29 U.S.C. § 207(a)(1). However, employees that work in "a bona fide executive, administrative, or professional capacity" are exempt from the overtime requirement. 29 U.S.C. § 213(a)(1). The authority to define and maintain the scope of these exemptions has been delegated by Congress to the Secretary of Labor. *Id.* The Secretary of Labor's regulations, therefore, have the "force and effect of law." ***Batterton v. Francis***, 432 U.S. 416, 425, 97 S. Ct. 2399, 53 L. Ed. 2d 448 (1977).

As set forth by the "General Rule" employed by federal courts, the administrative duties test involves a three-part inquiry. To meet the administrative duties test: (1) the employee must be paid on a salary basis as defined by the regulations, (2) the employee's primary duty is "the performance of office or non-manual work directly related to the management or general

1026317\306702803.v2

business operations of the employer or the employer's customers, and (3) the employee's primary duty "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a); *Haywood v. North Am. Van Lines*, 121 F.3d 1066, 1069 (7th Cir. 1997) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). There is no dispute Rasmusson satisfied the first element of the administrative duties test.

### C. Rasmusson Performed Office Work Directly Related to the General Business Operations of Ozinga.

With respect to the second element of the test, the Code of Federal Regulations explains the phrase "directly related":

> The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a). The regulation's distinction between work involving "the running or servicing of the business," and work involving laboring "on a manufacturing production line or selling a product in a retail or service establishment" is noteworthy because it denotes activities ancillary to the business' core functions are administrative tasks, while activities comprising the core function of the business are not. *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012).

Rasmusson's primary duties as a Dispatcher are undoubtedly office/non-manual work related to Ozinga's general business operations. First, it is indisputable Rasmusson performed non-manual "office work."

Second, Rasmusson's work was directly related to Ozinga's business operations. Ozinga supplies ready mix concrete, aggregate materials, other building materials, and energy solutions

1026317\306702803.v2

to a wide array of commercial, residential, industrial, and agricultural customers through an extensive network of truck, rail, barge, and ship terminals. Rasmusson and other Dispatchers took customers' orders, input the orders into Ozinga's order system, scheduled the delivery of the customers' orders, and assigned drivers to the delivery. Without Dispatchers Ozinga's business would screech to a halt.

It is clear that Rasmusson performed non-manual, office work directly related to Ozinga's general business operations. Therefore, the second element of the administrative exemption test is satisfied.

### D. Rasmusson Regularly Exercised Discretion and Independent Judgment with Respect to Matters of Significance.

As for the third element of the administrative exemption test, the federal regulations explain the meaning of "discretion and independent judgment with respect to matters of significance." "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a).

The regulations set forth a non-exhaustive list of factors to consider in making the determination of whether a job requires the exercise of discretion and independent judgment, including whether the employee has authority to formulate, affect, or implement operating practices; whether the employee carries out major assignments in conducting the operations of the business; and whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business. 29 C.F.R. § 541.202(b).

1026317\306702803.v2

The regulations also make clear that the phrase "discretion and independent judgment" does not require that the employee have carte-blanche authority to make decisions without review or approval by employees further up the reporting chain. § 541.202(c). For example, employees exercise discretion and independent judgment by making recommendations for action. That the recommendation may be rejected or revised by superiors does not mean the employee is not exercising discretion and independent judgment."

### 1. Rasmusson exercised discretion and independent judgment to consult and advise customers.

Based on her knowledge, training, and information provided by the customer about their project, Rasmusson used discretion and independent judgment to advise and consult with customers to make decisions about product mix to select the best product for their project. Rasmusson utilized specialized knowledge about various types of concretes and additives, mix designs, and what their particular uses are, and evaluated the customers' projects, weather conditions, and time of year to suggest value-add products to customers to best complete their projects. The majority of calls taken by Dispatchers involve a discussion with customers about mix design and value-add products.

### 2. Rasmusson exercised discretion and independent judgment to effectuate timely, efficient delivery to customers and resolve issues.

Rasmusson and other Ozinga Dispatchers were responsible for coordinating the timely delivery of product from Ozinga's plant locations to the customers' job sites according to the customers' requests and expectations while using the most efficient and cost-effective processes possible. Rasmusson selected and assigned drivers to deliver customers' orders based on availability, union rules, and location. To ensure maximum utilization and efficiency of Ozinga's resources, while also meeting the needs and expectations of customers, Rasmusson exercised independent discretion to schedule mixer trucks throughout the day to maintain an even schedule

1026317\306702803.v2

and avoid overloading any given part of the schedule. Rasmusson was required to monitor a GPS map and truck-tracking screen to ensure orders were moving in a timely manner, and if there was an issue with a truck or order, Rasmusson was responsible for working with the driver and/or the plant to create a solution and resolve issue to ensure the needs of the customer were met.

**3.    Rasmusson exercised discretion and independent judgment to create and alter driver schedules based on business need and the law.**

Rasmusson had independent discretion to create shift start and end times for Ozinga's drivers based on the demands for the following day, and exercised independent discretion to adjust those times throughout the day, as necessary, based on order status and workflow. To ensure Ozinga's drivers did not violate Department of Transportation ("DOT") regulations, Rasmusson was required to monitor drivers' work hours and advise them to avoid exceeding the maximum driving hours allowable by the DOT, and to monitor drivers' shift end and, as necessary, adjusted their next start time to ensure at least the minimum required time between shifts. On certain Saturdays, Rasmusson worked as the only Dispatcher in the Milwaukee Office and was required to perform all of the duties Dispatchers without oversight.

**4.    Courts regularly find dispatchers with similar responsibilities to Rasmusson to be properly classified under the Administrative Exemption.**

Other courts analyzing the exempt status of dispatchers with similar or less responsibilities and discretion than Rasmusson, have found such employment positions to be exempt under the FLSA. ***Rock v. Ray Anthony Int'l, LLC***, 380 Fed. Appx. 875 (11th Cir. 2010) (affirming grant of summary judgment regarding administrative exemption where dispatcher exercised discretion when determining how best to resolve conflict and ensure that the customers' needs were being met despite conflict, and where maintaining schedule required a level of skill that went beyond applying well-established techniques, procedures, or specific

29

1026317\306702803.v2

standards described in manuals or other sources); ***Puentes v. Siboney Contracting Co.***, No. 9:11-cv-80964, 2012 U.S. Dist. LEXIS 150727, 2012 WL 5193417 (S.D. Fla. Oct. 19, 2012) (granting summary judgment to the defendant because the plaintiff, a truck dispatcher, exercised discretion in, among other things, assigning truck drivers to jobs, coordinating with customers, and deciding whether or not to use certain drivers, and was therefore exempt from the FLSA's overtime requirements under the administrative exemption); ***Perine v. ABF Freight Systems, Inc.***, 457 F. Supp. 2d 1004, 1016 (C.D. Cal. 2006) (granting summary judgment to the defendant where the Court held that the plaintiff, a freight dispatcher, was exempt under the administrative exemption because the plaintiff's position required him to analyze several factors when scheduling drivers, he was able to schedule deliveries as he wanted as long as the deliveries allowed the operation to be profitable, he scheduled drivers based on his past experience and not in accordance to any laid out rule, and his actions affected matters of great importance to the company); ***Harrison v. Preston Trucking Co.***, 201 F. Supp. 654, 656-57 (D. Md. 1962) (concluding that a dispatcher was exempt where the dispatcher was, at times, solely in charge, and remarking that dispatchers seem to generally be exempt under administrative exemption); ***Wade v. Werner Trucking Co.***, Case No. 2:10-cv-270, 2014 U.S. Dist. LEXIS 35653 (S.D. Ohio March 18, 2014) (holding that dispatchers exercised sufficient discretion to be exempt under the administrative exemption where they, among other things, monitored driver's DOT driving hours and made schedule adjustments to ensure compliance, had discretion to resolve load problems to ensure timely delivery).

Based on the above, Ozinga's classification of Rasmusson as overtime exempt under the administrative exemption was proper, and Rasmusson's overtime claims under the FLSA and WWPCL fail. Accordingly, Ozinga should be granted summary judgment on these claims.

1026317\306702803.v2

## CONCLUSION

For the reasons stated herein, Defendant Ozinga respectfully request that this Court grant its motion for summary judgment and dismiss Rasmusson's lawsuit accordingly.

Dated at Milwaukee, Wisconsin this 14th day of October, 2020.

/s/ Corey J. Swinick

David J. Hanus, State Bar No. 1027901
Corey J. Swinick, State Bar No. 1097530
Attorneys for Defendant OZINGA READY
MIX CONCRETE, INC.
**HINSHAW & CULBERTSON LLP**
100 E. Wisconsin Avenue, Suite 2600
Milwaukee, WI 53202
Phone No. 414-276-6464
Fax No. 414-276-9220
E-mail Address(es):
dhanus@hinshawlaw.com
cswinick@hinshawlaw.com

31

1026317\306702803.v2