# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JENNIFER RASMUSSON,**
      **Plaintiff,**

    **v.**                      **Case No. 19-C-1625**

**OZINGA READY MIX CONCRETE, INC.,**
      **Defendant.**

---

### DECISION AND ORDER

Plaintiff Jennifer Rasmusson,[1] brings this action against her former employer, Ozinga Ready Mix Concrete, Inc.,[1] under the Family and Medical Leave Act ("FMLA"), the Fair Labor Standards Act ("FLSA"), and Wisconsin's overtime law. Before me now is Ozinga's motion for summary judgment. *See* Fed. R. Civ. P. 56.

## I. BACKGROUND

Ozinga supplies ready mix concrete and other materials to commercial, residential, industrial, and agricultural customers using a fleet of cement trucks (and other forms of transportation that are not relevant to this case). During her employment at Ozinga, Rasmusson worked as a dispatcher in its Milwaukee office. At the time, the Milwaukee office employed six dispatchers. A dispatcher's duties included taking orders from customers, inputting the orders into Ozinga's order system, scheduling the delivery of orders, and assigning drivers to the delivery. *See* Def. Prop. Finding of Fact ("PFOF") ¶¶ 4–5. Of the six dispatchers, five worked staggered schedules during the day, and one

---

[1] In the complaint, the plaintiff identified the defendant as "Ozinga Redi Mix Concrete, Inc." The defendant states that its actual name is "Ozinga Ready Mix Concrete, Inc." I have amended the caption to reflect the defendant's spelling.

was assigned to the closing schedule. The dispatcher assigned to the closing schedule had to remain at his or her post until all trucks returned to the yard at the end of the day. During the busy summer season, the last truck might not return until 11:30 p.m. or after midnight. Rasmusson Dep. at 7. In addition to the six dispatchers, Ozinga employed a dispatch manager who supervised the dispatchers. Def. PFOF ¶ 15.

Ozinga hired Rasmusson as a dispatcher on March 6, 2017. When Rasmusson interviewed for the position, she was informed that Ozinga was hiring specifically for the closing schedule. For the first year and several months of her employment, Rasmusson was consistently assigned to the closing schedule.

In March 2018, Catherine Linscott, one of the dispatchers assigned to the midday schedule, left Ozinga. A short time later, Ozinga transferred an existing employee, Mark Yellen, into the position of dispatcher. From May 21 until June 25, 2018, Yellen was assigned to the midday schedule, working from 7:00 a.m. to 5:00 p.m. Def. PFOF ¶ 44. Ozinga contends that when it made Yellen a dispatcher, it intended to have him indefinitely fill Linscott's midday schedule. It points out that it completed an "employee change form" at the time he became a dispatcher that indicated he was filling the open dispatcher position. *Id.* ¶ 40. However, this form reflects only that Yellen was made a dispatcher because there was an opening in the department; it does not indicate that he was hired specifically to work the midday schedule. *See* ECF No. 23-2.

In early 2018, Rasmusson became pregnant. She then realized that, as a single mother, she would need to find someone to care for the child while she worked, and that the unusual and unpredictable hours associated with the closing schedule would make finding childcare difficult. For this reason, she claims, on April 3, 2018, she had a meeting

2

with the dispatch manager, Todd Olson, and informed him that she needed a more stable work schedule. Rasmusson Decl. ¶¶ 5, 7. According to Rasmusson, the meeting ended with Olson's agreeing to reassign her to the midday schedule slot that Linscott had recently vacated. *Id.* ¶ 7. Rasmusson claims that "[i]t was later discussed" with individuals in Ozinga's human resources department that she would be reassigned to the midday schedule. *Id.* However, Rasmusson continued to work the closing schedule until June 25, 2018, when she was reassigned to the midday schedule and Yellen was reassigned to the closing schedule.

It is undisputed that Rasmusson was assigned to the midday schedule from June 25, 2018 until September 14, 2018, when she took FMLA leave. However, Ozinga disputes Rasmusson's claim that it permanently reassigned her to the midday schedule. According to Ozinga, the reassignment was only a temporary accommodation of her pregnancy. Ozinga claims that it first reassigned Rasmusson to the midday schedule at the end of June to allow her to attend prenatal appointments in the afternoon and evenings. Def. PFOF ¶ 48. On July 9, 2018 and August 23, 2018, Rasmusson's physician faxed restrictions to Ozinga that limited the number of hours she could work. *Id.* ¶¶ 49–50. With these restrictions in place, Rasmusson could not have worked the closing schedule. Ozinga contends that, to accommodate Rasmusson's medical restrictions, it allowed her to remain on the midday schedule. *Id.* ¶ 51. Ozinga denies that it agreed to permanently move Rasmusson to the midday schedule to assist her with childcare. *Id.* ¶ 53. Instead, Ozinga contends, it always intended to return her to the closing schedule once her medical restrictions were lifted. *Id.* ¶ 55.

3

Ozinga did not require Rasmusson to take FMLA leave to attend her prenatal appointments; it allowed her to save that leave so that she could take a full twelve weeks of maternity leave once her child was born. Def. PFOF ¶ 46.

On September 14, 2018, Rasmusson learned that her baby had died in utero. She delivered her son two days later. Following these tragic events, Rasmusson took twelve weeks of FMLA leave, from September 14, 2018 to December 9, 2018. Ozinga paid Rasmusson for the full twelve weeks. Def. PFOF ¶ 59. While she was on FMLA leave, Yellen continued to work the closing schedule. According to Rasmusson, while she was on leave, a member of Ozinga's human resources department, Justin Kratochvil, called her and suggested that, because she did not have a baby to bond with, she should consider returning to work after six weeks. Pl. PFOF ¶ 23.

On December 7, 2018, three days before Rasmusson returned from leave, Todd Olson emailed Ozinga's dispatchers their schedule for the next week. The schedule had Rasmusson assigned to close and Yellen back on the midday schedule. Olson states that he returned Rasmusson to the closing schedule because she no longer had medical restrictions that limited her to working midday shifts, and because she had been hired to work the closing schedule. Olson Dep. at 23–24. Rasmusson, however, was confused by the schedule, as she thought she had been permanently moved to the midday schedule. Rasmusson responded to Olson's email and asked him whether she was now indefinitely reassigned to the closing schedule, and he said yes. Rasmusson then emailed Ozinga's human resources department and asked why she was not being returned to the position she occupied before she took FMLA leave.

4

Following Rasmusson's complaint, representatives from Ozinga's human resources department internally discussed her concerns. They talked to Todd Olson and Justin Kratochvil, who informed them that Rasmusson had been hired to work the closing schedule and had only temporarily been reassigned to the midday shift to accommodate her pregnancy and medical restrictions. On December 12, 2018, Rasmusson attended a meeting with Olson, Kratochvil, and another person from human resources. Ozinga claims that, at this meeting, Rasmusson was told that her reassignment to the midday shift was only a temporary accommodation of her pregnancy and restrictions and that she was now being returned to the closing schedule, which was the schedule she was hired for. Rasmusson disputes that she was told the reassignment was only temporary. However, Kratochvil's contemporaneous email summary of the meeting states that "it was explained to [Rasmusson] that any alterations to hours (from the designated closure role) were provided to her as a temporary accommodation to the circumstances she was going through, including doctor visits and doctor restrictions through her pregnancy." ECF No. 23-3.

For the next eight months, Rasmusson worked the closing schedule. During this time, Ozinga changed how it classified dispatchers in the Milwaukee office for purposes of the overtime provisions of the FLSA and equivalent state law. Until 2019, the dispatchers were paid an hourly wage and earned overtime for all hours worked in excess of 40 each week. However, effective March 2, 2019, Ozinga began paying the Milwaukee dispatchers salaries and classified them as overtime exempt. Rasmusson considered this change to be disadvantageous to her because, as the dispatcher working the closing

schedule, she routinely worked more than 40 hours a week during busy seasons and earned substantial overtime pay.

After Rasmusson returned from FMLA leave, Rasmusson's medical providers occasionally recommended or required that she take additional, intermittent leaves of absence. Although by this time Rasmusson had exhausted her FMLA leave, Ozinga allowed Rasmusson to take additional leave and paid her for the time off. Specifically, Ozinga allowed Rasmusson to take paid medical leave from January 22–26, 2019; from February 13–17, 2019; from April 1–3, 2019; and from August 7–13, 2019. Rasmusson needed the final period of leave in August 2019 to reduce stress and manage her grief as the first anniversary of her son's death approached. Pl. PFOF ¶¶ 52–54.

On August 9, 2019, while Rasmusson was using paid leave, Ozinga sent her a letter about her attendance. *See* ECF No. 32-12. The letter, which was signed by Justin Kratochvil, began by noting that Ozinga had allowed Rasmusson to take paid medical leave through August 14 even though she had exhausted her vacation time and FMLA leave. Kratochvil then emphasized that regular attendance and physical presence in the office were essential functions of Rasmusson's job. At this point, Kratochvil recited the "many accommodations" Ozinga had granted Rasmusson over the last eighteen months to deal with her health and personal matters. Kratochvil attached a table to his letter that listed the dates on which Ozinga had allowed Rasmusson to miss work. He emphasized that the time off she was granted was "well in excess of what is typically provided to employees." In the course of identifying Rasmusson's absences, Kratochvil noted that she was "absent from work under FMLA leave" from September 17, 2018 to December 8, 2018. Kratochvil added that, besides her many excused absences, Rasmusson also

6

had accrued "26 unapproved tardies" during the first eight months of 2019. The tardies ranged "from being only a few minutes late to being over an hour-and-a-half late on at least one occasion." The letter concluded with a warning:

> Considering the August 8, 2019 letter from your Doctor, we expect you to return to work, at the start of your scheduled shift, on Wednesday August 14, 2019. Other than the previously-approved excused absence for September 16, 2019, the Company cannot afford to provide you any additional time off, nor will any further tardiness be acceptable. Should you fail to show up to work on time for your schedule[d] shifts, the Company will have no choice but to terminate your employment.

ECF No. 32-12.

After receiving Kratochvil's letter on August 9, Rasmusson sent him an email in which she expressed confusion over being accused of tardiness. Rasmusson told Kratochvil that she remembers him telling her that it was okay to be five or ten minutes late. On August 12, 2019, Kratochvil responded by denying that he ever told Rasmusson, or anyone, that it was acceptable to be late. That same day, Rasmusson sent a response to Kratochvil in which she said she "firmly disagree[d]" with his statement that he never said it was acceptable to be late, but that she would be ready to go at 9:00 a.m. on August 14. ECF No. 23-6.

On August 13, 2019, the day before Rasmusson was to return from leave, Todd Olson sent her an email in which he informed her that she was "extremely behind" in completing certain online training assignments. ECF No. 32-13. Olson asked Rasmusson to "make use of any slow time throughout the day, or while waiting for trucks to return in the evening, to get caught up on the assignments." *Id.* Later that same day, Rasmusson emailed Olson and informed him that she had completed the training assignments. *Id.*

7

Rasmusson did not report for work on August 14, 2019. Instead, she emailed a statement to Olson, Kratochvil, and others at Ozinga in which she resigned her employment. In her statement, Rasmusson stated that she felt Ozinga did not treat her morally or ethically during the most difficult time of her life. She expressed her belief that Ozinga had singled her out for making mistakes that were not her fault or that would have been laughed off if made by other employees. She reiterated her belief that, before she took FMLA leave, Ozinga had agreed to permanently transfer her to the midday schedule because she "would need to have more stable hours due to childcare post delivery." ECF No. 21-7 at 127. She deemed Ozinga's decision to return her to the closing schedule after she lost the baby "careless, cruel, and unprofessional." *Id.* She claimed that Ozinga's decision to classify her as overtime exempt caused a 21% decrease in her pay. She also found it unacceptable that Ozinga had sent her a letter about her attendance and reminded her that she was behind on training assignments while she was out on medical leave to manage her stress.

Shortly after she resigned, Rasmusson commenced this action. She brings three claims. First, she contends that Ozinga's failure to return her to the midday schedule when she returned from FMLA leave violated the FMLA's requirement that an employee be restored to the position he or she held prior to using FMLA leave. Second, she contends that Ozinga retaliated against her for exercising her rights under the FMLA by subjecting her to "a disproportionate amount of criticism and disdain." Br. in Opp. at 1. She contends that Ozinga's alleged retaliatory conduct, including sending her a warning letter about her attendance, resulted in her constructive termination. Finally, she contends that Ozinga

8

violated the overtime requirements of the FMLA and Wisconsin law when it reclassified her position as overtime exempt. Ozinga now moves for summary judgment on all claims.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

### A.  FMLA: Failure to Restore to Prior Position

The FMLA allows an eligible employee to take twelve workweeks of leave during each twelve-month period for certain specified reasons. *See* 29 U.S.C. § 2612. An employee on FMLA leave is entitled to be restored to the same position he or she had prior to taking such leave (or to an equivalent position). *Id.* § 2614(a)(1). However, the FMLA provides that it must not be construed to entitle a restored employee to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Id.* § 2614(a)(3)(B). Citing this provision, the Seventh Circuit has said that "an employee's right to reinstatement is not absolute." *Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 712 (7th Cir. 2009). This means that "[a]n employee is not entitled to return to her prior position if she would have been demoted or terminated regardless of whether she took FMLA leave." *Id.*

When an employee claims that the FMLA entitled him or her to reinstatement, the employee bears the burden of establishing the right to reinstatement. *Rice v. Sunrise*

9

*Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000). But if the employer wishes to claim that it would not have reinstated the employee even if the employee had not taken leave, the employer must submit evidence to support that assertion. *Id.* When that burden of production has been met, however, the employee must ultimately convince the trier of fact, by a preponderance of the evidence, that, despite the alternate characterization offered by the employer, he or she would have been reinstated if leave had not been taken. *Id.*

In the present case, Ozinga concedes that the leave Rasmusson took from September 14 to December 9, 2018 was protected by the FMLA. Further, Ozinga does not dispute that, because of the substantial difference in working hours, a dispatcher working the closing schedule is not an equivalent position to a dispatcher working the midday schedule. However, Ozinga disputes that it violated the FMLA's job-restoration requirement when it placed Rasmusson on the closing schedule at the conclusion of her leave. According to Ozinga, Rasmusson's "position" for FMLA purposes at the time she took leave was a dispatcher working the closing schedule. Ozinga notes that it hired Rasmusson specifically for the closing schedule, and it contends that her reassignment to the midday schedule was only a temporary accommodation of her pregnancy and related medical restrictions. Ozinga claims that it always intended to return Rasmusson to the closing schedule once her restrictions were lifted, which they had been by the time she returned from FMLA leave.

The plaintiff challenges Ozinga's contention that her reassignment to the midday schedule was only a temporary accommodation of her pregnancy and medical restrictions. According to her, Ozinga agreed, during a meeting held on April 3, 2018, to

10

permanently reassign her to the recently vacated midday schedule so that she would have a more stable schedule that would make it easier for her to find childcare after her baby was born. Rasmusson Decl. ¶¶ 3–7; Rasmusson Dep. at 26:7–26:25, 29:5–29:10, 43:22–44:3. The plaintiff contends that, because Ozinga agreed to permanently reassign her to the midday position before she took FMLA leave, it was obligated to restore her to that position when she returned.

The parties spend much of their briefs arguing over whether the record would permit a reasonable jury to find that, before the plaintiff used FMLA leave, Ozinga had permanently reassigned her to the midday schedule. However, the ultimate question of fact in this case is not whether the plaintiff's reassignment to the midday schedule was intended to be temporary or permanent, but whether Ozinga's reason for returning the plaintiff to the closing schedule at the end of her FMLA leave was caused by her use of such leave. *See Goelzer v. Sheboygan County, Wis.*, 604 F.3d 987, 993 (7th Cir. 2010) (stating that the question at summary judgment in FMLA case is "whether a jury could find that the defendants did not reinstate [the employee] because she exercised her right to take FMLA leave"). I point this out because, as I am about to explain, even under the plaintiff's version of the facts, Ozinga's reason for returning her to the closing schedule was not related to her use of FMLA leave.

As noted, Ozinga claims that it only temporarily reassigned Rasmusson to the midday schedule to accommodate her prenatal appointments and medical restrictions, and that it returned her to the closing schedule at the end of her leave because, by that time, she no longer needed to attend prenatal appointments and her restrictions had been lifted. In contrast, Rasmusson contends that, before she took leave, Ozinga told her that

11

she could remain in the midday position indefinitely because, once her child was born, she would be unable to work the closing schedule, which involved unpredictable hours that could last late into the night. Rasmusson believes that, when she returned from leave, Ozinga put her back on the closing schedule because she did not have a child to care for and therefore could keep the unpredictable and late hours associated with that schedule. *See* Rasmusson Dep. at 49:4–49:5 (stating that returning her to closing schedule was Ozinga "basically saying to me that you don't have a kid so you can close now."). Importantly, though, even if the plaintiff's view of the facts were correct, she would not have shown that Ozinga returned her to the closing schedule *because she used FMLA leave*. Instead, she would have shown that Ozinga returned her to the closing schedule because her anticipated childcare needs did not materialize. Perhaps Ozinga's returning Rasmusson to the closing schedule for this reason would have been, as Rasmusson put it in her resignation letter, "careless, cruel, and unprofessional," ECF No. 21-7 at 127, but it would not have violated the FMLA, as it was not motivated by her use of leave.

Accordingly, the plaintiff's focus on Ozinga's alleged agreement to allow her to remain on the midday schedule for childcare purposes does not show a genuine dispute of material fact. Although her argument counters Ozinga's claim that it would have returned her to the closing schedule even if she had delivered a healthy baby, it does so by providing an alternative *lawful* explanation for Ozinga's action. Thus, in rebutting Ozinga's proffered reason, Rasmusson does not allow the jury to infer that the only rational explanation for Ozinga's action was her use of FMLA leave.

In addition to arguing that Ozinga agreed to reassign her to the midday schedule to accommodate her anticipated childcare needs, the plaintiff asserts that "[i]f [she] had

not taken her FMLA-qualifying leave, she would have remained in the same midday dispatcher position as had been agreed upon with Mr. Olson." Br. in Opp. at 8. However, she points to no evidence that supports this assertion. *See id.* Instead, she contends that "[t]he only event that occurred between the date she was assigned to the midday position and when it was taken away was [her] FMLA leave." *Id.* at 8–9. But, as I just discussed, this contention is inaccurate. Besides her taking FMLA leave, other relevant events occurred, namely, the end of her medical restrictions and her no longer needing a scheduling accommodation for childcare purposes. Rasmusson makes no attempt to show that it was the leave rather than her no longer needing these accommodations that caused Ozinga to return her to the closing schedule.

Although Rasmusson does not, in her brief, point to facts from which the jury could conclude that Ozinga returned her to the closing schedule because she used FMLA leave, I have reviewed the evidence cited in the plaintiff's proposed findings of fact to determine whether it would enable a reasonable jury to find that Ozinga returned her to the closing schedule for this reason. I conclude that it would not. The person who initially decided to return Rasmusson to the closing schedule was Todd Olson, the dispatch manager. *See* Olson Dep. at 51:15–51:23. When Rasmusson questioned why she was being returned to the closing schedule, Olson asked Justin Kratochvil from human resources for guidance, and he advised Olson that his decision was correct. *Id.* at 51:25–52:6. Based on this evidence, a reasonable jury could find that Olson and Kratochvil were each involved in the decision to return Rasmusson to the closing schedule. But a reasonable jury could not also find that either of these men was motivated by Rasmusson's use of FMLA leave. At his deposition, Olson testified that Rasmusson's FMLA leave presented

13

his department with a "hardship" because it occurred during the busiest time of year. Olson Dep. at 49:4–49:13. But he also made clear that he did not retaliate against Rasmusson for creating this hardship or seek to reward Yellen for filling the closing schedule during her absence. *Id.* at 49:20–49:24, 65:13–65:19. While it might be tempting to say that a jury could infer that Olson retaliated against Rasmusson by returning her to the closing schedule because he found her use of FMLA leave inconvenient, that inference would not be reasonable. The FMLA, by its nature, imposes a hardship on businesses, in that it requires them to leave a position vacant for as many as twelve weeks unless it can find a temporary worker. A jury cannot reasonably infer that simply because the business realized the hardship, any adverse action it took against the employee upon her return must have been motivated by her use of leave.

Rasmusson points out that Olson testified he thought that she should be disciplined for missing work. Pl. PFOF ¶ 51. However, during this part of his testimony, Olson was not being asked whether he thought that Rasmusson should be disciplined for missing work *while on FMLA leave. See* Olson Dep. at 46:9–48:17. Instead, he was asked about her attendance generally, and it is undisputed that, in addition to her FMLA leave, Rasmusson missed a lot of work during the last year and several months of her employment. Further, during his testimony about whether Rasmusson should be disciplined, Olson referred specifically to instances in which she took time off for reasons that he thought were questionable, and such instances did not involve her needing to take FMLA leave after losing her baby. Instead, he mentioned "boyfriend trouble, some dental thing that went wrong, [and] burn injuries." *Id.* at 48:4–48:17. Finally, Olson also testified that he never took any action to discipline her for taking the non-FMLA leave that he

14

thought was questionable. *See id.* at 47:17–48:3. For these reasons, Olson's opinion about whether Rasmusson should have been disciplined for her attendance does not give rise to a reasonable inference that he returned her to the closing schedule because she used FMLA leave.

As for Kratochvil, Rasmusson points out that he contacted her while she was on FMLA leave and told her that, because she did not have a baby to bond with, she should consider returning to work after six weeks rather than twelve. Pl. PFOF ¶ 23. However, while Kratochvil's comment could be regarded as insensitive, it does not suggest that he approved Olson's decision to return her to the closing schedule because he wanted to retaliate against her for using all twelve weeks of her FMLA leave. Moreover, no other evidence in the record suggests that Kratochvil allowed Olson to put Rasmusson back on the closing schedule because she used FMLA leave.

In sum, Ozinga has submitted evidence showing that it would have returned Rasmusson to the closing schedule even if she had not taken leave. The evidence is that Ozinga had transferred her to the midday schedule only to accommodate her pregnancy and medical restrictions, which had expired by the time she returned from FMLA leave. Rasmusson raises a factual dispute about whether Ozinga told her she would remain on the midday schedule after her child was born to accommodate her childcare needs, and she contends that Ozinga returned her to the closing schedule because her anticipated childcare needs did not materialize. But even under Rasmusson's view of the facts, Ozinga's reason for returning her to the closing schedule would not have been related to her use of FMLA leave. Further, the evidence in the record does not otherwise give rise to a reasonable inference that Rasmusson was returned to the closing schedule because

15

she used FMLA leave. Thus, Rasmusson cannot carry her burden to show that she would not have been returned to the closing schedule had she not taken FMLA leave. *See Rice*, 209 F.3d at 1018. Ozinga is entitled to summary judgment on this claim.

## B. FMLA: Retaliation/Constructive Discharge

Rasmusson brings an FMLA retaliation claim in which she contends that she was constructively discharged because of her use of FMLA leave. *See* 29 U.S.C. § 2615(a)(2). To prevail on an FMLA retaliation claim, an employee must prove three elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). Here, Ozinga concedes that Rasmusson engaged in statutorily protected activity when she used FMLA leave. However, it contends that Rasmusson cannot prove either that it took an adverse action against her or that any adverse action was caused by her use of FMLA leave.

Rasmusson claims that she suffered an adverse action in the form of a constructive discharge. In cases involving employment-discrimination laws, courts have recognized that a constructive discharge may take one of two forms. In the first form, an employee resigns due to alleged discriminatory harassment. *See Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). To prove that a constructive discharge of this form occurred, a plaintiff must show that remaining on the job would have forced her to endure "working conditions even more egregious than that required for a hostile work environment claim." *Id.* The second form of constructive discharge occurs when an employer acts in a manner that causes a reasonable employee to believe that he or she has been terminated or that termination is imminent. *Id.* Here, Rasmusson claims that her

16

resignation could be viewed as a constructive discharge of either form. She claims that her working conditions became so intolerable that no reasonable employee could be expected to endure them, and she contends that Ozinga's letter to her about her attendance caused her to reasonably believe that her termination was imminent. As explained below, neither of these arguments has merit.

Rasmusson claims that her workplace became intolerable for a variety of reasons. First, she states that "[i]mmediately before," and upon her return from FMLA leave, she was "continually singled out and blamed for mistakes that were not [her] fault or were not solely [her] fault." Rasmusson Decl. ¶ 12. She gives as an example an instance in which she was blamed for Mark Yellen's mistakenly failing to delete an order, which resulted in a loss of product. *Id.* ¶ 13. She also states that she was "continually criticized for mistakes that were blamed on [her] while mistakes that were made by other dispatchers were laughed off." *Id.*¶ 14. Second, she contends that one of her coworkers, "Dino," continually singled her out and treated her in a negative way. *Id.* ¶ 15. Rasmusson does not describe Dino's conduct, but Todd Olson testified about Dino at his deposition. According to Olson, Rasmusson complained to him that Dino had once made a vulgar comment about a driver. Olson Dep. at 53:15–53:23. In response to her complaint, Olson and Kratochvil "brought Dino in, talked to him about it, gave him a verbal warning, and put a note in his file." *Id.* at 54. Rasmusson says that she asked to have her desk moved away from Dino's, but that Olson did not grant her request. Rasmusson Decl. ¶ 15. At his deposition, Olson said that he did not move Rasmusson's desk because the desks were set up in such a way that even if Rasmusson's desk were moved she would have still been in Dino's proximity. Olson Dep. at 54:3–54:17. Third, Rasmusson claims that the decisions to

17

reassign her to the closing schedule and to later designate her position as overtime exempt contributed to the intolerable work environment. Fourth, she claims that Ozinga's alleged insensitivity to her grief, especially around the time of her resignation, added to the intolerable working conditions. She notes that she first asked to take additional medical leave on July 25, 2019 but that her supervisors did not address her request until her doctor submitted a letter on August 7, 2019. She also notes that while she was taking leave to manage her grief, Ozinga chastised her about her attendance and her failure to complete training assignments.

An initial problem with Rasmusson's claim that her working conditions were intolerable is that almost none of the allegedly hostile treatment she describes is connected to her use of FMLA leave, and thus it could not be viewed as harassment prohibited by the FMLA. *See Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 750 (7th Cir. 2018) (noting that federal employment laws do not impose a flat ban on all harassment and only prohibit harassment based on a protected trait). First, even if it is true that Rasmusson was continually singled out for mistakes while others were not,[2] by her own admission this behavior occurred before she used FMLA leave as well as after, Rasmusson Decl. ¶ 12, and thus a jury could not reasonably infer that such treatment was caused by her use of FMLA leave. Further, no other evidence in the record supports an inference that Ozinga treated her unfairly because she exercised her rights under the FMLA. Indeed, Ozinga went beyond what the FMLA required by paying Rasmusson for

---

[2] Notably, Rasmusson describes only one instance in which she was unfairly singled out for a mistake—the instance involving Yellen's mistake—and thus she supplies no factual support for her conclusory assertion that she was "continually" singled out.

18

her FMLA leave and granting her additional paid leave after she had exhausted her FMLA leave and vacation time. Second, Dino's alleged harassment was clearly unrelated to her use of leave, and no evidence suggests that Ozinga's response to her complaint would have been different had she not used leave. Third, because Ozinga reclassified all the dispatchers as overtime exempt, her reclassification could not have been motivated by her use of leave. Fourth, to the extent that Ozinga's conduct worsened her grief or stress, there is no evidence that anyone at Ozinga intended to cause her emotional distress because she exercised her rights under the FMLA. The only alleged conduct that arguably relates to her use of FMLA leave is the decision to return her to the closing schedule at the conclusion of her leave. However, as I explained in the prior section of this opinion, the evidence does not permit a reasonable jury to find that Ozinga returned Rasmusson to the closing schedule because she used FMLA leave.

A second problem with Rasmusson's claim that intolerable working conditions resulted in her constructive termination is that the conditions she describes do not rise to the level of a hostile work environment, much less the even harsher environment needed to support a constructive discharge. To establish a hostile work environment, a plaintiff must show that the harassment was so severe or pervasive that it altered the conditions of employment. *See, e.g., Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 560 (7th Cir. 2019). Factors that may be considered in deciding whether this standard is met include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). Here, Rasmusson does not describe conduct that fits within these

19

factors. The only conduct that might fairly be characterized as harassment is Dino's making a vulgar comment about a driver. But Rasmusson does not claim to have felt threatened or humiliated by the comment, and Ozinga gave Dino a verbal warning over the incident. Rasmusson does not submit evidence from which the jury could conclude that Dino continued to make vulgar comments after Ozinga told him to stop. Accordingly, Rasmusson cannot prevail on a claim of constructive discharge based on intolerable working conditions.

Rasmusson's claim that she was constructively discharged because her termination was imminent at the time she resigned also fails. There is simply no evidence that Rasmusson would have been terminated if she did not resign. Rasmusson relies on the fact that, just prior to her resignation, Ozinga sent her a letter warning her that she would be terminated if she failed to show up on time for her scheduled shifts. But the clear intent of the letter was to inform her that Ozinga was changing its approach to her attendance. The letter informed her that although Ozinga had in the past been generous in granting her leave and tolerating her tardiness, it would no longer be so generous. The letter did not tell Rasmusson she was being fired or was about to be fired because of her past attendance issues; it warned her that if her attendance did not improve, she would be terminated. No reasonable employee could construe this letter to mean that she had been terminated or that termination was imminent. Indeed, the Seventh Circuit has held that an employee is not constructively terminated even when the employer begins a process that stands a high chance of ending with termination. *See Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333–34 (7th Cir. 2004). The court observed that courts should not "engage in speculation," *id.* at 333, and that "[a] legal rule that employees may

20

leave at the first sign of dissatisfaction . . . would be incompatible with their duty to mitigate damages," *id.* at 334.

In any event, even if Rasmusson could show that the letter about her attendance resulted in a constructive discharge, she could not also show a causal connection between the letter and her use of FMLA leave. Rasmusson returned from FMLA leave on December 10, 2018; the letter was sent on August 9, 2019. During the intervening eight months, Rasmusson missed quite a bit of work and was tardy on twenty-six occasions. Considering her attendance history, Ozinga's decision to send the letter when it did cannot reasonably regarded as suspicious. The timing shows that Ozinga was reacting to Rasmusson's ongoing attendance issues rather than her use of FMLA leave eight months earlier.

Rasmusson notes that Ozinga's letter specifically references her FMLA leave and suggests that this gives rise to a reasonable inference that Ozinga retaliated against her for using such leave. However, the letter simply lists the FMLA leave in the part of the letter in which Ozinga identifies all the leave Rasmusson had taken over the prior year and a half. *See* ECF No. 32-12 at 1.[3] The letter did not suggest that she should not have taken that leave or state that she was being penalized for having used FMLA leave. Indeed, as noted, the letter did not purport to penalize Rasmusson at all; it only warned

_____

[3] The paragraph in which the reference to FMLA leave appears states: "In 2018, the Company permitted you to take 10 sick days, 10 vacation days, plus an additional 2 excused absences, and afforded you an additional 18 opportunities to arrive late or early. Furthermore, from September 17, 2018 until December 8, 2018, you were absent from work under FMLA leave." ECF No. 32-12 at 1.

her that from that point forward, Ozinga expected her to attend work as scheduled. Thus, the reference to FMLA leave in the letter would not enable a reasonable jury to find that Ozinga retaliated against Rasmusson for exercising her rights under the FMLA.

In short, a reasonable jury could not find that Rasmusson suffered a constructive discharge or that, if she did, the discharge was caused by her use of FMLA leave. Accordingly, Ozinga is entitled to summary judgment on her FMLA retaliation claim.

## C.    FLSA and Wisconsin Overtime Claim

Finally, Rasmusson claims that Ozinga's decision to reclassify her position as overtime exempt violated the FLSA and Wisconsin's overtime law. The FLSA provides that if an employee works more than 40 hours in a workweek, the employee must be paid compensation for the additional hours at a rate of one and one-half times the employee's regular rate. 29 U.S.C. § 207(a)(1). However, the FLSA exempts many categories of employees from the requirement to pay overtime. *See* 29 U.S.C. § 213. In the present case, Ozinga claims that Rasmusson's position fell within the exemption for an "employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1).

A Department of Labor regulation explains that the administrative exemption applies to any employee:

> (1) Compensated on a salary or fee basis . . . at a rate [not less than the amount specified by regulation] . . .;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

22

29 C.F.R. § 541.200(a). In the present case, there is no dispute that, once Ozinga reclassified her as overtime exempt, it began paying her a salary that satisfied the first element of the regulation. The questions presented are whether the remaining two elements are satisfied. In answering these questions, I must conduct "a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012).

1. **Work "Directly Related" to "Management or General Business Operations"**

The second element of the administrative exemption test requires that the employee's "primary duty [be] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2). A separate Department of Labor regulation provides further guidance on the meaning of this requirement. It states in relevant part that, "[t]o meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The regulation further states that "[w]ork directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.209(b).

23

In the present case, Rasmusson's position as a dispatcher was not in any of the "functional areas" specified by the Department of Labor as being directly related to management or general business operations. However, this is not dispositive, for the Department of Labor makes clear that a position may satisfy this element even if it does not fall within one of the listed functional areas. On the other side of the balance, Rasmusson's job did not involve "working on a manufacturing production line or selling a product in a retail or service establishment," 29 C.F.R. § 541.201(a), and thus her position was not clearly nonexempt.

When an employee's job duties do not fall within the Department of Labor's examples of positions that do or do not involve work directly related to management or general business operations, it can be difficult to apply the definition. This is because the regulation is "pretty vague" and there is a "gap" between the Department's examples and the regulation's intended scope. *See Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 981 (7th Cir. 2011). In general, courts proceed by drawing analogies between the employee's job duties and the duties of prototypical exempt and nonexempt employees. In *Verkuilen*, for example, the court found the plaintiff's job nonexempt because, among other reasons, she was "not a salesman for Best Buy or a technician sitting at a phone bank fielding random calls from her employer's customers"—positions that the court regarded as clearly nonexempt. *Id.* at 982.

In the present case, the evidence in the record about Rasmusson's job duties does not entitle Ozinga to summary judgment on the issue of whether her primary duty was the performance of work directly related to the management or general business operations of Ozinga. To start, there is no evidence that Rasmusson's job duties involved

24

"management." Ozinga does not contend that its dispatchers supervised the drivers, and because Ozinga employed a separate dispatch manager, Rasmusson did not supervise other dispatchers. Thus, Rasmusson's position could satisfy this element of the regulation only if her primary duty directly related to the general business operations of Ozinga.

Ozinga contends that Rasmusson's work directly related to its general business operations because she "took customers' orders, input the orders into Ozinga's order system, scheduled the delivery of the customers' orders, and assigned drivers to the delivery." Br. in Supp. at 27. Ozinga notes that "[w]ithout Dispatchers, Ozinga's business would screech to a halt." *Id.* But this point is irrelevant to the question of whether her work related to general business operations. The business of a manufacturer might screech to a halt without its assembly-line workers, but such workers are part of the "manufacturing production line" and thus are clearly outside the scope of the administrative exemption. 29 C.F.R. § 541.201(a). Here, the question is not whether Rasmusson's work was important to Ozinga, but whether it related to general business operations.

Rasmusson's duties of taking orders, entering them into the system, scheduling delivery, and assigning drivers to the delivery are more analogous to the work of a manufacturing production worker or a retail sales representative than to a prototypical administrative employee such as an employee in human resources or accounting. Rasmusson's duties related to the production of Ozinga's central service: delivering concrete and related materials to its customers' job sites. Although Rasmusson did not load concrete or drive the trucks to the job site, her duties were as much a part of the delivery of concrete as were the duties of drivers and manual laborers. She did not spend significant time performing tasks that were ancillary to concrete delivery, such as

25

completing accounting forms or ensuring that the company complied with OSHA requirements.[4] For these reasons, Rasmusson's primary duties did not involve "the running or servicing of the business" within the meaning of 29 C.F.R. § 541.201(a). *See Schaefer-LaRose*, 679 F.3d at 574 ("[W]hen an employee is engaged in the core function of a business, his or her task is not properly categorized as administrative.").

Ozinga contends that, besides taking orders and assigning drivers to delivery, Rasmusson's job involved other tasks that related to the general servicing of the business rather than production work. *See* Reply Br. at 13–14. First, Ozinga contends that Rasmusson "worked with drivers and/or the plant to create solutions and resolve issues with trucks or customer orders." *Id.* at 13. But this work is just an aspect of Ozinga's core function, delivering concrete. Moreover, Rasmusson testified at her deposition that she "rarely" communicated with drivers and that, when she communicated with the plant, it was the plant manager that told her what to do. Rasmusson Dep. at 16:4–16:12. Thus, even if working with drivers and the plant to solve problems were administrative functions, on the present record I cannot conclude that they were Rasmusson's "primary duty." 29 C.F.R. § 541.200(a)(2).

Second, Ozinga contends that Rasmusson "advised customers regarding and resolved scheduling conflicts to ensure the needs of the customer were met." Reply Br. at 13. By this, Ozinga means that, when a customer asked for delivery at a time when

---

[4] Ozinga claims Rasmusson's job involved ensuring compliance with Department of Transportation ("DOT") regulations. *See* Def. PFOF ¶ 134. However, Rasmusson testified at her deposition that this was not one of her duties. Rasmusson Dep. at 17:14–17:17. Thus, for purposes of summary judgment, I must assume that Rasmusson's job did not involve DOT compliance.

26

Ozinga did not have an opening, Rasmusson would "try to coordinate to move things around to accommodate their order." Kratochvil Dep. at 18:3–18:11. In other words, this is a task that relates to scheduling deliveries, which, as I have already noted, is part of Ozinga's core business of delivering concrete and therefore not an administrative task. *See Schaefer-LaRose*, 679 F.3d at 574. The same is true of the third task Ozinga cites, which is "complet[ing] orders accurately and timely to ensure customer satisfaction and Ozinga profitability." Reply Br. at 13.

Fourth, Ozinga contends that Rasmusson "created shift start and end times for drivers based on demands for the following day and adjusted those times based on order status and workflow." Reply Br. at 13–14. Creating a schedule likely qualifies as an administrative task rather than production work, but this was only one part of Rasmusson's job, and the record does not permit me to find that this was her primary duty.

Fifth, Ozinga contends that Rasmusson "evaluated remaining workload and union rules to determine when to send drivers home." Reply Br. at 14. Because this relates to scheduling, it is arguably an administrative task. However, Rasmusson testified at her deposition that plant managers were the ones who decided when to send drivers home. Rasmusson Dep. at 18:18–18:25. Thus, for purposes of summary judgment, I must assume that this task was not a part of Rasmusson's job or that, if it was, it was not part of her primary duties.

Finally, Ozinga contends that Rasmusson "monitored drivers' work hours and shift end times to ensure compliance with DOT regulations." Reply Br. at 14. To some extent, this task involves "regulatory compliance" and thus might qualify as a task relating to

27

general business operations. *See* 29 C.F.R. § 541.201(b). However, at her deposition, Rasmusson testified that she did not "ensure that drivers were in compliance with local state and federal DOT guidelines and regulations." Rasmusson Dep. at 17:14–17:17. Thus, for purposes of summary judgment, I must assume that this was not a task that she performed.

Ozinga also cites various nonbinding federal cases in which courts found that the duties of dispatchers directly related to the management or general business operations of the employer. However, in those cases, the dispatchers did more than take orders and arrange for delivery; those dispatchers generally exercised supervisory or management functions over the dispatch department or and/or the drivers, and it was these functions that brought them within the administrative exemption. *See Rock v. Ray Anthony Int'l., LLC*, 380 F. App'x 875, 877 (11th Cir. 2010) (upholding district court's finding that employee "effectively managed Sunbelt's crane rental department"); *Wade v. Werner Trucking Co.*, No. 2:10-CV-270, 2014 WL 1091707, at *15 (S.D. Ohio March 18, 2014) (deeming it "generally correct to say that dispatchers whose activities do not go beyond the paradigmatic dispatch duties of communicating and tracking vehicles are not usually exempt while those whose jobs encompass other responsibilities often are exempt"); *Puentes v. Siboney Contracting Co.*, No. 9:11-CV-80964, 2012 WL 5193417, at *5 (S.D. Fla. Oct. 19, 2012) (finding that the plaintiff "was in charge of all activities relating to the daily dispatch and running of the trucking services by [the employer] in Central Florida"); *Perine v. ABF Freight Sys., Inc.*, 457 F. Supp. 2d 1004, 1015–16 (C.D. Cal. 2006) (finding

that dispatcher acted in a "supervisory capacity").[5] In the present case, Rasmusson did not supervise drivers or other dispatchers. Moreover, as discussed above, when the evidence is viewed in the light most favorable to Rasmusson, it appears that she did little more than take customer orders and schedule them for delivery. As these tasks amounted to production work that related to Ozinga's core business, I cannot find as a matter of law that Rasmusson's primary duty was the performance of work directly related to the management or general business operations of the employer or the employer's customers. Accordingly, Ozinga is not entitled to summary judgment on this issue.

## 2. Primary Duty Includes the Exercise of Discretion and Independent Judgment

The third and final element of the administrative exemption is satisfied when the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Again, a separate Department of Labor regulation elaborates on the meaning of this requirement. The regulation states that, "[i]n general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* § 541.202(a). The regulation states that the term "matters of significance" refers to the level of

---

[5] *Perine* is also distinguishable on the ground that it was decided under a California overtime law with an administrative exemption that the court explicitly recognized was different than the exemption under the FMLA. 457 F. Supp. 2d at 1011. Ozinga also cites *Harrison v. Preston Trucking Co.*, but in that case, the parties stipulated that the plaintiff's work directly related to management policies or general business operations of his employer. 201 F. Supp. 654, 655–56 (D. Md. 1962). Moreover, the court found that the dispatcher was the "boss" of twenty truck drivers and eight to ten freight handlers, *id.* at 656, and thus the dispatcher did more than communicate with drivers and track vehicles.

importance or consequence of the work performed. *Id.* The regulation also identifies many factors that may be considered in determining whether the employee exercises discretion on matters of significance. The factors range from "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices" to "whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." *Id.* § 541.202(b).

The regulation further provides that although "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision[,] . . . employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). It adds that "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e).

Ozinga contends that Rasmusson exercised discretion and independent judgment with respect to matters of significance in three respects. *See* Br. in Supp. at 28–29. First, it contends that Rasmusson advised customers about what kinds of concrete to choose for their projects. Initially, I question whether offering advice to customers about which product to choose involves the exercise of discretion and independent judgment with respect to matters of significance. A "salesman for Best Buy" will offer advice to customers about which products to purchase, but a retail salesperson is not an administrative employee. *See Verkuilen*, 646 F.3d at 982. In any event, at her deposition, Rasmusson testified that she rarely gave advice to customers about which concrete was best for their

30

projects. She testified that Ozinga's customers knew what they wanted to order and that she did little more than repeat their orders back to them for verification and accuracy. Rasmusson Dep. at 12:7–13:4. Thus, even if advising a customer about a product purchase involves the exercise of discretion on matters of significance, for purposes of summary judgment, I must assume that it was not part of Rasmusson's primary duty.

Second, Ozinga contends that Rasmusson exercised discretion on matters of significance because she performed several tasks that related to the "timely, efficient delivery" of concrete. Br. in Supp. at 28–29. These tasks included assigning drivers to a delivery "based on availability, union rules, and location," scheduling mixer trucks throughout the day "to maintain an even schedule and avoid overloading any given part of the schedule," monitoring a GPS map that showed trucks' locations, and working with the driver and/or the plant to resolve issues that arose. *Id.* Again, I question whether these duties involved the exercise of discretion on matters of significance. These duties appear to involve no more than the "paradigmatic dispatch duties of communicating and tracking vehicles," which are generally not deemed administrative. *See Wade*, 2014 WL 1091707, at *15. Perhaps the only task that is even arguably administrative is working with the driver or plant to resolve issues that arose, but Rasmusson testified at her deposition that she rarely communicated with drivers and that the plant managers told her what to do. *See* Rasmusson Dep. at 16:4–16:12. Thus, based on the summary -judgment record, I cannot find that these tasks involved exercising discretion on matters of significance or that, if they did, they were part of Rasmusson's primary duty.

Finally, Ozinga contends that Rasmusson exercised discretion and independent judgment when she created shift start and end times for Ozinga's drivers and adjusted

them as needed throughout the day. As I noted above, scheduling may be an administrative task, but the record does not establish that scheduling was such a large part of Rasmusson's job that it was her primary duty. Moreover, Rasmusson testified that she never set driver start times or adjusted driver schedules on her own and that the plant managers were the ones who decided driver end times. *See* Rasmusson Dep. at 18:11–18:21. Thus, for purposes of summary judgment, I must assume that Rasmusson's primary duty did not involve exercising discretion in the area of scheduling.

In sum, viewing the evidence in the light most favorable to Rasmusson, I cannot conclude that she exercised discretion and independent judgment with respect to matters of significance. Accordingly, Ozinga is not entitled to summary judgment on this issue.

### 3.    Wisconsin Overtime Law

Wisconsin's overtime law is substantially similar to the overtime requirements of the FLSA. *See* Wis. Stat. § 103.02. Like the federal Department of Labor, the state's Department of Workforce Development ("DWD") has issued a regulation that contains an exemption for persons "whose primary duty consists of administrative . . . work." Wis. Admin. Code § DWD 274.04(1). The DWD's regulation contains some of the same elements as the federal regulation, including the elements that the employee's primary duty be related to management or general business operations and that the employee exercise discretion and independent judgment. *Id.* § DWD 274.01(b). As discussed above, Ozinga is not entitled to summary judgment with respect to these elements. Therefore, it is not entitled to summary judgment with respect to Rasmusson's claim under the Wisconsin overtime law.

32

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Ozinga's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted with respect to plaintiff's claims under the FMLA and denied with respect to her claims under the FLSA and Wisconsin overtime law.

Dated at Milwaukee, Wisconsin, this 19th day of January, 2021.


s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge